UNITED STATES of America

v.

William A. HANHARDT, Joseph N. Basinski, and Guy Altobello, Defendants.

No. 00 CR 853.

United States District Court, N.D. Illinois, Eastern Division.

March 13, 2006.

John F. Podliska, United States Attorney's Office, Pretrial Services, Probation Department, Chicago, IL, for Plaintiff.

Carolyn Pelling Gurland, James John Cutrone, Jenson and Gillespie, Chicago, IL, Jeffrey Neal Cole, Cole & States, Ltd., Chicago, IL, William A. Von Hoene, Jr., Thomas P. Sullivan, Jenner & Block, LLC, Chicago, IL, James Andrew Klenk, Leslie Dean Davis, Natalie J. Spears, Sonnenschein, Nath & Rosenthal, LLP, Chicago, IL, Joseph R. Lemersal, Michael Joseph Kralovec, Nash, Lalich & Kralovec, Chicago, IL, Jeffrey Bruce Steinback, Law Offices of Jeffrey B. Steinback, Chicago, IL, Andrew Theodore Staes, Staes & Scallan, PC, Chicago, IL, Paul Augustus Wagner, Attorney at Law, Chicago, IL, Marc William Martin, Marc W. Martin, Ltd., Chicago, IL, Santo John Volpe, Chicago, IL, Raymond D. Pijon, Attorney at Law, Chicago, IL, John M. Beal, Chicago, IL, for Defendants.

## OPINION AND ORDER

NORGLE, District Judge.

Before the court is a limited remand from the Seventh Circuit Court of Appeals pursuant to *United States v. Paladino*, 401 F.3d 471 (7th Cir.2005), directing this court to indicate whether it would have sentenced the three Defendants differently, had the Federal Sentencing Guidelines ("Guidelines") been advisory rather than mandatory at the time of sentencing. For the following reasons, the court determines that it would not have sentenced these Defendants differently had the Guidelines been advisory rather than mandatory.

## I. INTRODUCTION

### A. Facts

Defendant William A. Hanhardt ("Hanhardt") had a career spanning approximately thirty years with the Chicago Police Department ("CPD"), and he held several high-ranking positions in the CPD, including Commanding Officer of the Criminal Intelligence Unit, 14th District Police Commander, and Chief of Detectives. Hanhardt, however, betrayed his office, the City of Chicago, and the CPD in a most egregious manner. Beginning in the early 1980s, and continuing until 1998, Hanhardt acted as the leader of a sophisticated criminal enterprise which was associated with organized crime, and involved in jewelry theft. This enterprise consisted of Hanhardt, Joseph N. Basinski, ("Basinski"), Guy Altobello ("Altobello"), Paul J. Schiro ("Schiro"), Sam DeStefano ("DeStefano"), William Brown ("Brown"), and others.

The court will outline the nature of this conspiracy below, but in its simplest terms, these individuals were involved in the targeting and surveillance of traveling jewelry salespersons for the purposes of stealing their inventory. More than 100 jewelry salespersons were identified and targeted, and at least nine jewelry thefts were actually committed, netting the conspirators in excess of $5 million. These thefts occurred in at least seven states, including Arizona, California, Michigan, Minnesota, Ohio, Texas, and Wisconsin.

Hanhardt was the director of this conspiracy. In that capacity, he supervised Basinski and the other members of the conspiracy. Together, Hanhardt and Basinski commanded the activities of numerous individuals associated with the enterprise. Under Hanhardt's leadership, participants in this conspiracy, including Basinski and Altobello, gathered information on numerous potential jewelry theft victims through physical surveillance. Among those surveilled were: a Nafco Gems, Ltd. representative, his residence, car, and place of business in Arizona on various occasions in 1995 and 1996; a jewelry appraiser, his car and residence in Arizona in 1996; a Mayfield Company representative, her car, residence, and place of business in Arizona in 1996; a Baume & Mercier salesperson, his car and residence in Illinois in 1996; and a Kobi Katz, Inc./Lieber & Solow, Ltd. salesperson's residence in Illinois in 1996. Members of the conspiracy also physically surveilled jewelry stores in Phoenix, Scottsdale, and Glendale, Arizona.

In addition to the physical surveillance of jewelry salespeople and jewelry stores, Hanhardt and Basinski attended numerous jewelry trade shows designed for jewelry wholesalers and retailers in order to identify individuals involved in the jewelry trade, and to evaluate the quality and quantity of merchandise offered by these wholesalers and retailers. Hanhardt and Basinski attended jewelry trade shows in Tucson, Arizona and Las Vegas, Nevada.

Physical surveillance, however, was not the only means by which Hanhardt and the other conspiracy members were able to obtain information regarding potential theft victims. Remarkably, Hanhardt requested that CPD officers undertake database searches of CPD and other law enforcement computers to obtain information regarding jewelry salespersons. Among these database searches were: a search for the Arizona license plate of a Nafco Gems, Ltd. representative's car, utilizing the National Law Enforcement Telecommunications System ("NLETS") on January 20, 1996; a search for the Arizona license plate of a jewelry appraiser's car, utilizing NLETS, on February 7, 1996; and four separate searches for Illinois license plates of various jewelry company salespersons or representatives in 1996.

Hanhardt also used a private investigator in the District of Columbia to conduct credit bureau database searches, along with other commercial database searches, to obtain personal and financial information regarding traveling jewelry salespersons. These database inquiries included numerous searches through credit reporting companies such as Database Technologies, Inc., Equifax Credit Information Services, Inc., and Trans Union Corporation. These searches occurred at various times during the years 1992–1996. Finally, Hanhardt used the telephone at his residence in Deerfield, Illinois, to gather information and direct the activities of the conspirators.

Hanhardt and the other members of the conspiracy also participated in the theft of jewelry. In all, the conspirators stole at least $5 million worth of jewelry. These thefts included the following: a theft from the vehicle of a Baume & Mericer, Inc. salesperson of approximately 180 watches worth $310,000 in Glendale, Wisconsin, on October 8, 1984; a theft from the vehicle of a Rolex Watch, USA, Inc. salesperson of watches having a value of approximately $500,000 in Monterrey, California, in October 1986; a theft of jewelry worth approximately $125,000 from a Gordon Brothers Corporation salesperson in Englewood, Ohio, in August 1989; a theft from a Gem Platinum salesperson of jewelry worth ap-

proximately $1,300,000, in Dallas, Texas, in June 1992; a theft from another Gen Platinum salesperson of jewelry worth approximately $1,000,000 in Flat Rock, Michigan, in June 1993; a theft from a H.K. Mallak, Inc. salesperson of jewelry worth approximately $240,000 in Mankato, Minnesota, on August 3, 1993; a theft from jewelry company representatives of jewels worth approximately $170,000 in Phoenix, Arizona, on May 7, 1994; and a theft from safety deposit boxes at a Columbus, Ohio hotel of jewelry and United States currency worth approximately $1,500,000, on August 27, 1994. Another victim of this conspiracy was subjected to an armed robbery in which he was threatened with a gun, struck on the head with that gun, and bound hand and foot. The conspirators also attempted at least two other robberies.

The government's investigation of this conspiracy lasted approximately four and a half years, and spanned several states. During this investigation, the District Court of the Northern District of Illinois authorized numerous wiretaps, in accordance with Title III of the Omnibus Crime and Safe Streets Act of 1968, 18 U.S.C. § 2510 et seq., and several pen registration/caller i.d devices. Many of these wiretaps were authorized by then Chief Judge Aspen, however, this court authorized between 20% and 30% of all the orders authorizing wiretaps and i.d. devices. These wiretaps resulted in the interception of numerous conversations on Basinski's Arizona home and cellular telephone, and on Hanhardt's home telephone in Deerfield, Illinois.

The FBI also observed the conspirators conducting physical surveillance of jewelers in Arizona, Illinois, Wisconsin, Nevada, and Indiana. The government obtained photographs and videotapes of the conspirators engaged in criminal activities, and through the use of cooperating individuals, recovered some of the stolen jewelry. In addition, the government obtained telephone records which showed contact between the conspirators. Acting pursuant to a search warrant, the government obtained hundreds of documents maintained by the conspirators. These documents contained personal and financial information on jewelry salespersons, including credit reports, car rental agreements, bank account information, non-published home telephone numbers, home addresses, and travel itineraries. Again operating pursuant to a search warrant, the government seized twenty-eight briefcases, boxes, and containers holding the sophisticated tools used by the conspirators during these thefts, including electronic eavesdropping equipment, locksmith tools, hotel keys, key blanks, key cutting dies, and keymaking machines. Finally, the government recovered three loaded weapons: a Browning 7mm pistol, a Colt .38 revolver, and a North American Arms .22 revolver.

## B. Procedural History

Hanhardt and the five Co–Defendants were indicted on October 19, 2000. Hanhardt, Basinski, DeStefano, Schiro, and Altobello were indicted for one count of racketeering conspiracy, in violation of 18 U.S.C. § 1962(d). Hanhardt, Basinski, Schiro, and Brown were indicted with conspiracy to transport stolen property in interstate commerce, in violation of 18 U.S.C. § 371. Defendants then filed numerous pretrial motions. The court wrote and published several Opinions in response to these motions.

Defendants first moved the court to recuse itself from this case, asserting, *inter alia*, that an objective observer would question this court's impartiality, as the court's probable cause determinations while issuing wiretap and i.d orders, its

immunization of witnesses, and its review of case materials had biased the court against Defendants. *United States v. Hanhardt*, 134 F.Supp.2d 972, 975 (N.D.Ill. 2001) (*"Hanhardt I"*). The court determined that its rulings and knowledge of the case did not create any bias, real or perceived, against Defendants, and denied the motion to recuse. *Id.* at 975–78.

Next, Basinski moved the court to suppress evidence obtained from a search of his briefcase. In 1997, Basinski had given a briefcase to a friend, William Friedman, and instructed Friedman to burn the briefcase and its contents. *United States v. Basinski*, 155 F.Supp.2d 840, 843 (N.D.Ill. 2001) (*"Basinski II"*). Instead of burning the briefcase, however, Friedman told the FBI about the briefcase. *Id.* FBI agents, without a warrant, then seized that briefcase, and obtained evidence contained therein. *Id.* Apparently infuriated by Friedman's betrayal, Basinski allegedly went to Friedman's home and attacked him. *Id.* This attack resulted in charges of retaliating against a witness and obstruction of justice, in violation of 18 U.S.C. §§ 1513(b) and 1503(a). *Id.* In that case, Basinski moved to suppress any evidence obtained from the warrantless search of his briefcase. Judge Coar granted that motion, and the Seventh Circuit affirmed. *United States v. Basinski*, 226 F.3d 829, 833–39 (7th Cir.2000) (*"Basinski I"*). The government then dismissed the retaliation and obstruction charges against Basinski.

Shortly after that case was dismissed, the government submitted an application for a search warrant to re-search Basinski's briefcase. *Basinski II*, 155 F.Supp.2d at 844. This application was accompanied by appropriate affidavits and exhibits referring to facts in existence pri-

or to the original search of Basinski's briefcase. *Id.* Chief Judge Aspen issued the warrant. The government then served the warrant on Basinski, and re-searched the briefcase. *Id.*

Basinski moved this court to suppress the evidence found in his briefcase, asserting that the independent source doctrine did not properly apply to this case, and that the Seventh Circuit's decision collaterally estopped the government from re-litigating whether the briefcase should be suppressed. *Id.* at 845. This court determined that there was "ample evidence of probable cause to search Basinski's briefcase, all of it independent of and predating the February 23, 1999 warrantless search of the briefcase." *Id.* at 852. The court also determined that collateral estoppel did not apply in this case, as no decision had yet been made by a trier of fact. *Id.* at 855. The court therefore declined to suppress the evidence found in Basinski's briefcase.[1] *Id.*

Hanhardt then moved the court to sever his trial from that of his Co–Defendants. *United States v. Hanhardt*, 151 F.Supp.2d 971 (N.D.Ill.2001) (*"Hanhardt II"*). The court noted that severance is required "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 973–74 (quoting *Zafiro v. United States*, 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993)). The court determined that Hanhardt had failed to establish that he would be prejudiced in any manner by a joint trial, and denied the motion. *Id.* at 974–75.

---

**1.** Hanhardt filed a motion to join in Basinski's motion to suppress. The court denied this motion in a separate Order.

Hanhardt and Basinski next moved the court to continue the September 4, 2001 trial date. *United States v. Hanhardt,* 155 F.Supp.2d 861 (N.D.Ill.2001) (*"Hanhardt III"*); *United States v. Basinski,* 156 F.Supp.2d 988 (N.D.Ill.2001) (*"Basinski III"*). The court wrote separate Opinions in order "to reiterate important issues concerning criminal defendants in pre-trial detention and the public interest in speedy trials." *Basinski III,* 156 F.Supp.2d at 991. However, the factual and legal issues examined in these Opinions, and the court's reasoning and conclusions, were very similar. Hanhardt asserted that a continuance was required because his attorney would be engaged in an arbitration hearing at the same time as the trial, thus potentially depriving Hanhardt of his choice of counsel. *Hanhardt III,* 155 F.Supp.2d at 866. In addition, both Hanhardt and Basinski asserted that a continuance was required because of the complexity of the case, and the voluminous written material turned over by the government. *Id.*

As to the contention that a continuance was required because Hanhardt's attorney had a scheduling conflict between this case and an arbitration matter, the court first noted that "[t]he Sixth Amendment right to counsel of choice does not encompass a right to counsel who cannot comply with the court's reasonable schedule." *Id.* at 868 (citing *United States v. Delia,* 925 F.2d 574, 575 (2nd Cir.1991)). Citing *United States v. Hughey,* 147 F.3d 423, 431–32 (5th Cir.1998), the court determined, *inter alia,* that Hanhardt's attorney had not offered substantial proof that the arbitration date was immovable, and that the requested continuance could result in an unaccept-

able delay of the trial. *Hanhardt III,* 155 F.Supp.2d at 876.

As to the contention that counsel needed more time to prepare for trial, the court first noted that it had granted numerous defense motions for extensions of time to file pre-trial motions. *Id.* at 877. Citing *United States v. Avery,* 208 F.3d 597, 602 (7th Cir.2000), the court determined, *inter alia,* that because the trial date was eleven months after indictment and nine months after current counsel appeared, there had been adequate time to prepare for trial. *Hanhardt III,* 155 F.Supp.2d at 877. The court also determined that because the case involved simple allegations of jewelry theft, this matter was not so complex as to require a continuance. *Id.* at 878. Finally, the court explained that the efficient administration of justice would be better served by having this case go to trial as scheduled. *Id.* at 879. For all these reasons, the court ultimately denied Hanhardt and Basinski's motions to continue the trial date.[2]

Defendants also filed a motion to suppress evidence obtained from Title III intercepts of communications made on Hanhardt's home telephone, and additional telephones and pagers used by Defendants. *United States v. Hanhardt,* 157 F.Supp.2d 978 (N.D.Ill.2001) (*"Hanhardt IV"*). The court first noted that

> The intercept authorization may issue upon a determination that the applicant's factual statements demonstrate probable cause to believe that a particular person has committed, is committing, or is about to commit an offense, that there is probable cause to believe that particular communications concerning the offense will be obtained through interception, and that normal investigative

---

**2.** The court also denied the motions of Co-Defendants Shiro, DeStefano, and Altobello to continue the trial date.

techniques have been tried, or reasonably appear unlikely to succeed, or are too dangerous.

*Id.* at 984 (citing 18 U.S.C. § 2518(3)). The court then determined that the "materials submitted to Chief Judge Aspen provided an ample basis on which to find probable cause." *Id.* at 985. These materials, submitted by FBI agent McNamara, included the following: information from named and confidential informants alleging connections between organized crime in Chicago and Hanhardt and Basinski; analysis of activity made on a telephone card that was identified by an informant as being used by Hanhardt and Basinski to communicate concerning alleged thefts; and analysis of telephone records indicating numerous calls between Hanhardt, Basinski, and members of organized crime in Chicago. *Id.* at 988. The court found that "[t]his information is more than facially sufficient to find probable cause that certain Defendants were using the targeted phone number as part of a conspiracy to deal in stolen goods." *Id.* at 988–89.

The court further found that the informants were reliable, given that they had (1) provided details of their background in organized crime, (2) provided objectively verifiable facts regarding organized crime, and (3) provided reliable information in the past. *Id.* at 990. The court also determined that McNamara's submission included sufficient assertions indicating that numerous other investigative techniques would be inadequate in this case. *Id.* at 995. The court therefore denied Defendants' motion to suppress the Title III intercepts. *Id.* at 997.

All Defendants ultimately pled guilty to the indictment. DeStefano pled pursuant to a written plea agreement on August 24, 2001. Basinski pled pursuant to a written plea agreement on August 31, 2001. Altobello submitted a blind plea on September 26, 2001. Schiro pled pursuant to a written plea agreement on October 11, 2001. Hanhardt submitted a blind plea on October 25, 2001. Brown pled pursuant to a written plea agreement on May 7, 2002.

The Defendants were initially sentenced to the following terms of imprisonment: Hanhardt, 188 months; Basinski, 108 months; Schiro, 65 months; DeStefano, 60 months; Altobello, 65 months; and Brown, 25 months.[3] Hanhardt's sentence included $5,145,000 in restitution. In December 2004, the court granted the government's motion for entry of order of garnishment of Hanhardt's monthly annuity payments from the City of Chicago. *United States v. Hanhardt,* 353 F.Supp.2d 957 (N.D.Ill. 2004) (*"Hanhardt VII"*). The court made the following findings and adjustments at Defendants' sentencing hearings.[4]

### 1. Hanhardt

The court found that Hanhardt was a leader of the criminal enterprise, and that Hanhardt was responsible for an armed robbery of a jewelry salesperson. The court imposed a two-level enhancement to Hanhardt's offense level, pursuant to Guidelines § 3C1.1, upon determining that Hanhardt had obstructed justice by intentionally overdosing on controlled substances. This intentional overdose caused Hanhardt to be hospitalized and subsequently miss a court date. The court also

---

**3.** The court denied Hanhardt's motion for release pending sentencing, finding, *inter alia,* that Hanhardt presented a risk of flight, and was a danger to the community. *United States v. Hanhardt,* 173 F.Supp.2d 801 (N.D.Ill.2001) (*"Hanhardt V"*).

**4.** This *Paladino* remand applies only to Hanhardt, Basinski, and Altobello. The court will therefore not analyze Schiro, DeStefano, and Brown's sentencing hearings.

enhanced Hanhardt's offense by two levels after determining that Hanhardt had participated in a theft from a person of another, pursuant to Guidelines § 2B1.1. Finally, the court denied Hanhardt's request for a downward departure for acceptance of responsibility. The court determined that Hanhardt's blind plea, coming nine days after the trial was scheduled to begin, and Hanhardt's evasive answers as to whether he agreed with the Assistant United States Attorney's statements at the plea colloquy, did not indicate a legitimate acceptance of responsibility on Hanhardt's part.

### 2. Basinski

The court found that Basinski was responsible, along with Hanhardt, for the previously mentioned armed robbery. The court imposed a two-level enhancement to Basinski's sentence for theft from the person of another, pursuant to Guidelines § 2B1.1. The court also imposed a two-level upward departure to Basinski's sentence based on its finding that Basinski's association with organized crime was used to further his criminal activities in this case. Finally, the court imposed a four-level enhancement to Basinski's sentence, pursuant to Guidelines § 3B1.1, based on its finding that Basinski was a leader of this criminal enterprise.

### 3. Altobello

The court found that Altobello obstructed justice when, during an interview with FBI agents in March 1998, he denied committing crimes, and denied affiliations with persons involved in criminal activity. The court therefore increased Altobello's offense level by two levels, pursuant to Guidelines § 3C1.1. The court also imposed a two level upward departure for Altobello's associations with organized crime. The court denied Altobello a downward departure for acceptance of responsi-

bility, reasoning that Altobello was not truthful about the degree of his involvement in this criminal enterprise. The court also imposed a two-level enhancement to Altobello's sentence for theft from the person of another, pursuant to Guidelines § 2B1.1. Finally, the court denied Altobello a downward departure for playing a minor role in this conspiracy, finding that Altobello had provided significant information to the other conspirators regarding jewelry salespersons who visited Altobello Jewelers, Inc., a retail jewelry store.

On appeal, the Seventh Circuit affirmed these sentences, including the level enhancements and upward departures, with two exceptions: the obstruction of justice enhancements. *United States v. Hanhardt*, 361 F.3d 382 (7th Cir.2004) ("*Hanhardt VI*"). As to Handhardt's obstruction enhancement, the appellate court first noted that the district court had "based [this] enhancement on its finding that Hanhardt had acted willfully, and with the specific intent not to be present in court ..., and that he had the intent to impede the prosecution of this case." *Id.* at 388. However, the appellate court determined that this finding was erroneous, characterizing Hanhardt's intentional overdose as an attempted suicide. "We do not believe that an attempted suicide can be considered an obstruction of justice ... The nature of suicide does not lend itself to a clear understanding of an individual's motivation other than the obvious intent to end his life." *Id.* at 388–89.

As to Altobello's obstruction enhancement, the appellate court, quoting Note 4(b) of § 3C1.1 of the Guidelines, indicated that " 'making false statements, not under oath, to law enforcement officers,' is included in the 'list of examples of types of conduct that ... do *not* warrant application of this enhancement....' " *Id.* at

389–90. The Seventh Circuit therefore vacated Hanhardt and Altobello's level enhancements for obstruction of justice, and remanded the case for re-sentencing. *Id.* at 395. On remand, the court re-sentenced Hanhardt to 141 months imprisonment, and re-sentenced Altobello to 53 months imprisonment. Both sentences were within the new appropriate Guidelines range.

Hanhardt, Basinski, and Altobello then appealed the Seventh Circuit's decision to the United States Supreme Court. The Supreme Court granted certiorari, vacated the judgments, and remanded the case to the Seventh Circuit "for further consideration in light of *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005)." *Altobello v. United States,* 543 U.S. 1097, 125 S.Ct. 994, 160 L.Ed.2d 996 (2005). The Seventh Circuit then ordered this "limited remand pursuant to *Paladino* to give the district judge an opportunity to determine whether he would reimpose his original sentences." *United States v. Hanhardt,* No. 02–2253, slip op. at 3 (7th Cir. June 8, 2005).

## II. DISCUSSION

### A. Standard for *Paladino* remand

In 1987, Congress promulgated the United States Sentencing Guidelines, which provided for a set of mandatory sentences for federal crimes. *See* 18 U.S.C. § 3553. Then, in *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), the Supreme Court declared these guidelines advisory, rather than mandatory. Defendants sentenced under the pre-*Booker* mandatory guidelines are now given limited remands to re-evaluate their sentences under the factors contained in 18 U.S.C. § 3553(a). *United States v. Welch,* 429 F.3d 702, 705 (7th Cir.2005); *see also United States v. Paladino,* 401 F.3d 471, 484 (7th Cir.2005).

Under these limited remands, the trial judge is asked "whether he would have given the defendant a shorter sentence had he realized the guidelines are merely advisory." *United States v. Goldberg,* 406 F.3d 891, 894 (7th Cir.2005); *see United States v. Hankton,* 432 F.3d 779, 796 (7th Cir.2005); *United States v. Spano,* 421 F.3d 599, 606 (7th Cir.2005). The district court cannot take into account post-sentencing factors upon this limited remand. *See United States v. Re,* 419 F.3d 582, 584 (7th Cir.2005) ("Post-sentencing events or conduct simply are not relevant to [the *Paladino* ] inquiry."). Instead, the sole purpose of a "*Paladino* remand" is for the district judge to inform the Seventh Circuit "whether [the defendant's] sentence would have been different had the Guidelines been applied as advisory rather than mandatory." *United States v. Santiago,* 428 F.3d 699, 705–06 (7th Cir.2005); *see Paladino,* 401 F.3d at 484.

If the district court judge would have imposed the same sentence had the guidelines been advisory, the Seventh Circuit "will affirm the original sentence against a plain-error challenge, provided that the sentence is reasonable." *Re,* 419 F.3d at 583. "Any sentence that is properly calculated under the Guidelines is entitled to a rebuttable presumption of reasonableness." *Welch,* 429 F.3d at 705; *see United States v. Johnson,* 427 F.3d 423, 426 (7th Cir.2005) (citing *United States v. Bryant,* 420 F.3d 652, 658 (7th Cir.2005)). It is the rare sentence "within the Guidelines range that 'stands out as unreasonable.'" *Welch,* 429 F.3d at 705 (quoting *United States v. Newsom,* 428 F.3d 685, 687 (7th Cir.2005)). Sentences that vary from the guidelines are "reasonable so long as the judge offers appropriate justification under the factors specified in § 3553(a)." *Johnson,* 427 F.3d at 426.

In the course of the limited *Paladino* remand, "the district court is to consider the sentencing factors set out in 18 U.S.C. § 3553(a)." *Re,* 419 F.3d at 583. These factors include, *inter alia:* the nature and circumstances of the offense, the history and characteristics of the defendant, the need to promote respect for the law, the need to provide just punishment for the offense, the need to afford adequate deterrence to criminal conduct, and the need to protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a); *United States v. Alburay,* 415 F.3d 782, 786 (7th Cir.2005).

## B. Hanhardt

■ After the Seventh Circuit vacated the court's imposition of a two-level enhancement for obstruction of justice, Hanhardt's offense level was reduced from 34 to 32. The court re-sentenced Hanhardt to 141 months imprisonment, near the middle of the new Guideline range of 121–151 months. Because this new sentence is within the Guideline range, it "is entitled to a rebuttable presumption of reasonableness." *See Welch,* 429 F.3d at 705. Hanhardt, however, now asserts that the court should indicate to the Seventh Circuit that, had the Guidelines been advisory rather than mandatory at the time of his sentencing, an appropriate sentence would have been only 121 months. Hanhardt contends that the following considerations support a reduction in his sentence: his guilty plea, his genuine remorse, his declining health, and his career as a police officer.

The court first addresses the issue of Hanhardt's guilty plea and remorse. As the court has previously noted, Hanhardt entered his plea nine days after his trial was scheduled to begin. In addition, Hanhardt's statements at the plea colloquy indicate that Hanhardt was not prepared to "demonstrate[ ] contrition through an honest and full account of his offense conduct." *Hanhardt VI,* 361 F.3d at 391. "After the government detailed the evidence that would have been presented against him, Hanhardt responded, 'I don't agree with everything he (Assistant United States Attorney Scully) said.' Tr. 10/25/01//41. When the court asked Hanhardt whether he was pleading guilty to Count One as alleged in the indictment, Hanhardt responded, 'In its entirety, no, sir.'" *Id.* at 390–91. Moreover, there is no indication in the record that Hanhardt, at the time of his sentencing, fully and completely accepted responsibility for his actions, or showed any genuine remorse for the harms caused by his crimes.

As to Hanhardt's allegations that he continues to suffer from numerous significant health problems, the court is sympathetic. Hanhardt represents to the court that he suffers from, *inter alia,* testicular cancer, congestive heart failure, spinal stenosis, and breathing problems. The court is well aware that a seventy-six year old man with serious health problems may face difficulties in adapting to life behind bars. The issue of Hanhardt's health was argued by counsel, and considered at his original sentencing. However, in this *Paladino* remand, the court cannot consider post-sentencing circumstances. *See Re,* 419 F.3d at 584 ("[I]n a *Paladino* remand the conduct or circumstances that bear on the § 3553(a) factors must have been in existence at the time the original sentence was imposed."). Hanhardt's new or worsening health problems, while seemingly quite serious, are not relevant for the purposes of this *Paladino* remand. *See id.*

Hanhardt next asserts that his sentence should be reduced because of his long career as a Chicago police officer. The court does acknowledge Hanhardt's lengthy career with the CPD. However, Hanhardt

committed at least one jewelry theft while still an active CPD officer, and he used other members of the CPD to obtain information regarding jewelry salespeople targeted by this conspiracy. Moreover, the government has submitted substantial evidence that while Hanhardt was a Chicago police officer, he had strong ties to organized crime. During the course of his thirty-plus year career with the CPD, Hanhardt assumed several positions of significant responsibility, including the position of Chief of Detectives. The City of Chicago and the CPD placed a great deal of trust in Hanhardt, and he betrayed that trust in a very serious manner. Hanhardt's career as a police officer is irrevocably stained by his actions as the leader of this criminal conspiracy, and this career cannot serve as a basis on which to reduce his sentence.

The court has considered the sentencing factors set out in 18 U.S.C. § 3553(a) and determines that it would reimpose Hanhardt's original (post-remand) 141 month sentence. Hanhardt was the leader of a jewelry theft ring with ties to organized crime that stole millions of dollars of merchandise from jewelry salespeople, sometimes at gunpoint, over a period of nearly twenty years. This sentence reflects the seriousness of Hanhardt's offense, promotes respect for the law, and protects the public from further crimes of Hanhardt. *See* 18 U.S.C. § 3553(a)(2). The court has considered the nature of this offense, and Hanhardt's history and characteristics. *See id.* at § 3553(a)(1). For the reasons listed above, Hanhardt has not overcome the rebuttable presumption that his sentence is reasonable. *See United States v. Mykytiuk,* 415 F.3d 606, 608 (7th Cir.2005) ("This is a deferential standard ... The

defendant can rebut this presumption only by demonstrating that his or her sentence is unreasonable when measured against the factors set forth in § 3553(a).").

## C. Basinski

■ Basinski asks the court to advise the Seventh Circuit that, had the Guidelines been advisory rather than mandatory at the time of his sentencing, an appropriate sentence would have been only 87 months. The court first notes that Basinski's original sentence was 108 months, at the high end, but within, the applicable Guideline range. Because this sentence is within the Guideline range, it "is entitled to a rebuttable presumption of reasonableness." *See Welch,* 429 F.3d at 705. Basinski asserts that the following considerations support a reduction in his sentence: his declining health, the court's application of an allegedly incorrect standard in making factual determinations at sentencing, and the fact that he is subject to removal from the United States.

The court is sympathetic to Basinski's concerns about his deteriorating health. Basinski is sixty years old, and, in his Position Paper on Limited Remand, asserts that he suffers from, *inter alia,* psoriasis, hepatitis C, an enlarged prostate, high glucose levels, and gum disease. In addition, in his Motion for Release, newly submitted to the court on March 7, 2006, Basinski indicates that he is now suffering from end-stage brain cancer, that he has begun a course of palliative radiation, and that he is not expected to survive beyond six months. Attached to this Motion is a twenty page submission regarding Basinski's medical issues.[5] This sad and unfortunate prognosis is not in dispute. However, these health problems have arisen, or

---

5. The government responded to this Motion on March 9, 2006. The court held a hearing on the Motion on March 10, 2006, and deter-

mined that it did not have jurisdiction to release Basinski at this time. *See* 18 U.S.C. 3582(c)(1)(A).

worsened, after Basinski was sentenced. As the court has already stated, it cannot consider post-sentencing circumstances in this limited remand. *See Re,* 419 F.3d at 584 ("[I]n a *Paladino* remand the conduct or circumstances that bear on the § 3553(a) factors must have been in existence at the time the original sentence was imposed."). The court notes that Basinski may be able to petition the Bureau of Prisons to move for what is commonly known as "compassionate release" pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).[6]

Basinski also asks the court to revisit factual determinations it made while imposing a two-level upward departure for participating in organized crime, and a two-level enhancement for theft from the person of another. Basinski asserts that the court should now use a beyond reasonable doubt standard, rather than a preponderance of the evidence standard, when revisiting these determinations. The Seventh Circuit has made it clear, however, that sentencing determinations should be made on a preponderance of the evidence standard. "The remedial portion of *Booker* held that decisions about sentencing factors will continue to be made by judges, on the preponderance of the evidence, an approach that comports with the sixth amendment so long as the guidelines system has some flexibility in application." *McReynolds v. United States,* 397 F.3d 479, 481 (7th Cir.2005). Moreover, the Seventh Circuit has already upheld both the enhancement and the upward departure. *Hanhardt VI,* 361 F.3d at 391–93. The court will therefore not revisit these factual determinations, nor revisit its im-

position of the resulting sentence enhancement and upward departure.

Finally, Basinski asks for a reduction in his sentence because of his status as a removable alien. However, the Seventh Circuit has consistently indicated that a criminal defendant's status as a removable alien "is relevant only insofar as it may lead to conditions of confinement, or other incidents of punishment, that are *substantially more onerous* than the framers of the guidelines contemplated in fixing the punishment range for the defendant's offense." *United States v. Macedo,* 406 F.3d 778, 794 (7th Cir.2005); *see also United States v. Meza–Urtado,* 351 F.3d 301, 305 (7th Cir.2003); *United States v. Gallo–Vasquez,* 284 F.3d 780, 784 (7th Cir.2002); *United States v. Guzman,* 236 F.3d 830, 834 (7th Cir.2001). Basinski's status as a removable alien is thus not relevant for the purposes of this *Paladino* remand. The court therefore declines to indicate to the Seventh Circuit that it would reduce Basinski's sentence on the grounds that he is a removable alien.

The court has again considered the sentencing factors set out in 18 U.S.C. § 3553(a) and determines that it would reimpose Basinski's original 108 month sentence. Basinski, along with Hanhardt, was a leader of this criminal enterprise. His activities as a leader of this conspiracy included: locating potential targets through physical surveillance and database searches, recruiting additional members of the conspiracy, and participating in the theft of jewelry. This sentence reflects the seriousness of Basinski's offense, promotes respect for the law, and provides adequate deterrence to criminal conduct of this na-

---

**6.** 18 U.S.C. 3582(c)(1)(A) provides, in part, that the court may modify a term of imprisonment upon the motion of the Director of the Bureau of Prisons if "extraordinary and compelling reasons warrant such a reduction." The court stated for the record, on March 10, 2006, that if the Director of the Bureau of Prisons were to make such a motion, the court would likely grant it. Basinski's status as a removable alien, however, could complicate this issue, as discussed within this Opinion.

ture. *See* 18 U.S.C. § 3553(a)(2). The court has considered the nature of this offense, and Basinski's characteristics. *See id.* at § 3553(a)(1). For the reasons listed above, Basinski, like Hanhardt, has not overcome the rebuttable presumption that his sentence is reasonable. *See Mykytiuk,* 415 F.3d at 608 ("This is a deferential standard ... The defendant can rebut this presumption only by demonstrating that his or her sentence is unreasonable when measured against the factors set forth in § 3553(a).").

## D. Altobello

■ After the Seventh Circuit set aside Altobello's enhancement for obstruction of justice, the court re-sentenced him to 53 months imprisonment. Altobello now asks the court to indicate that, had the Guidelines been advisory rather than mandatory at the time of his sentencing, a sentence of only 49 months would have been appropriate. Because this 53 month sentence is within the proper Guideline range, it is presumptively reasonable. *See Welch,* 429 F.3d at 705. Altobello asserts that the following considerations support a reduction in his sentence: his age and health problems, and his wife's deteriorating health.

Altobello is 73 years old. Quoting Judge Posner, Altobello asserts that crime is a "young man's game," and that "criminal careers taper off with age." *United States v. Jackson,* 835 F.2d 1195, 1199 (7th Cir. 1987). Altobello's risk of recidivism is therefore minimal, he argues. However, in *Jackson,* Judge Posner was referring to violent, armed bank robberies in which there is substantial "risk of physical injury to the criminal...." *Id.* Here, Altobello's role in the conspiracy was primarily to provide the conspirators with "information about traveling jewelry salespersons who came into his son's retail jewelry store, Altobello's Jewelers, Inc." *Hanhardt VI,*

361 F.3d at 391. There is no reason Altobello could not resume criminal activity of this nature upon his release from incarceration. The court therefore declines to find that Altobello's sentence should be reduced because of his age.

The health of Altobello was considered at the time of sentencing. Altobello now asserts that his health is declining, and he suffers from, *inter alia,* a heart condition and hepatitis B, while his wife suffers from arthritis and a heart condition. The court expresses its concern for Altobello and his wife's health problems. However, once again, the court cannot consider post-sentencing circumstances in this limited remand. *See Re,* 419 F.3d at 584 ("[I]n a *Paladino* remand the conduct or circumstances that bear on the § 3553(a) factors must have been in existence at the time the original sentence was imposed.").

The court has again considered the sentencing factors set out in 18 U.S.C. § 3553(a) and determines that it would reimpose Altobello's original (post-remand) 53 month sentence. Altobello funneled information about jewelry salespeople to the other members of a sophisticated theft ring with ties to organized crime. This criminal enterprise, of which Altobello was an integral part, stole over $5 million worth of jewelry over a nearly twenty year period. Altobello's sentence reflects the seriousness of his offense, promotes respect for the law, and protects the public from further crimes of Altobello. *See* 18 U.S.C. § 3553(a)(2). The court has considered the nature of this offense, and Altobello's characteristics. *See id.* at § 3553(a)(1). For the reasons listed above, Altobello, like Basinski and Hanhardt, has not overcome the rebuttable presumption that his sentence is reasonable. *See Mykytiuk,* 415 F.3d at 608 ("This is a deferential standard ... The defendant can rebut this presumption only by demonstrating that his or her sentence

is unreasonable when measured against the factors set forth in § 3553(a).").

## III. CONCLUSION

The Seventh Circuit has ordered this court to determine whether it would reimpose the Defendants' original sentences, in light of the fact that the Guidelines are now advisory rather than mandatory. These co-conspirators stole merchandise worth millions of dollars over a period of nearly twenty years. To impose a lesser sentence on any of these co-conspirators, who have maliciously stalked and stolen from unarmed, unprotected, and vulnerable salespersons out of sheer greed, would not serve as a deterrent to others, and would deprecate the seriousness of this conduct. For the foregoing reasons, the court determines that it would reimpose the Defendants' original sentences.